UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

BCM DEVELOPMENT, LLC,

                Plaintiff,

- against -

PETER OPRANDY as trustee of THE OPRANDY
TRUST, and THE OPRANDY TRUST,

                Defendants.
------------------------------------------------------------X

**ECF CASE**

**Index No. 08 Civ. 9050 (CS)**

**REPLY AFFIDAVIT**

STATE OF VIRGINIA    )
                           :ss.:
COUNTY OF ALBEMARLE  )

    PETER OPRANDY, being duly sworn, deposes and says:

    1.    I have been sued in this matter as a Trustee of the Oprandy Trust which is also a named defendant. I respectfully submit this affidavit in reply to that of Joseph Millstein, a principal of plaintiff BCM Development, LLC (hereinafter, "BCM") which has been submitted to the Court in opposition to the motion of the Defendants for an Order from this Court dismissing this action "with prejudice." I also respectfully refer the Court to the Reply Affirmation of our attorney, William H. Mulligan, Jr., and Reply Memorandum of Law submitted herewith.

    2.    While I believe the Court has been fully apprised of the pertinent factual background by way of the pre-motion letter of our attorney, William H. Mulligan, Jr., dated May 16, 2011, as well as his August 25, 2011 Affirmation with Exhibits in support of the motion (the "Mulligan Aff."), I feel the need to address certain misstatements made by Mr. Millstein. As our motion is based upon the documented default of plaintiff under the prior So-Ordered Stipulation, as amended, and as Mr. Mulligan explains, as the pending motion presents a pure question of

law, defendants saw no need to present any prior affidavits "based upon personal knowledge." Mr. Mulligan more than adequately presented the Court with the factual support for our motion.

3. Mr. Millstein asserts in his affidavit (at ¶ 4) that since the time that the original Contract was executed, "the parties had to engage in a number of activities on a collaborative basis, including governmental applications, approvals and a lawsuit, by way of example." This statement is not accurate. Other than obtaining my original executed consent to allow BCM to proceed with the subdivision approval, my participation was neither required nor sought. BCM also asserts that the original contract was "subject to the parties obtaining various governmental approvals required by the Town of Warwick, including approval for the construction of a water system for the subdivision." (Pl. Mem. Law, Statement of Material Facts, ¶¶ 2-3, p. 2). I note, however, that the Contract made no express condition for approval of a water system for the subdivision. Instead it was conditioned upon whatever "developmental approvals" were necessary which admittedly might implicitly include an approved water system.    4.

Similarly, as to the claim that "both BCM and Oprandy believed that the subdivision's water system would consist of individual wells for each of the forty (40) lots" (Id., ¶3), I never had such a belief. I certainly was aware that provisions for household water would be required, but I never discussed wells, their costs, nor a water system with Mr. Millstein. In addition, although Mr. Millstein refers to the fact that the subject property is "under water" (id., ¶10), he provides no specifics. While I am, of course, aware of the effects of recent bad weather throughout the Northeast, I find it inconceivable that the entire property is "under water" – unless Mr. Millstein is being euphemistic. A careful review of plaintiff's opposition papers reflects that all of the so-called "mistakes," mutual or otherwise, which plaintiff now seeks to rely upon in

order to avoid the relief requested in the motion, arise from circumstances known to BCM, but which it chose to deal with by way of seeking and obtaining amendments to the original Contract, not to terminate it. As reflected in the record to date, including the many exhibits attached to the Complaint itself, the Court will note that the original Contract between the parties was executed on October 16, 2001, nearly ten (10) years ago. Following its execution by me and Mr. Millstein, plaintiff sought and obtained no less than eight (8) separate amendments thereto, by which the closing on the sale of the property was ultimately extended from June 2003 until the final date of September 15, 2008. As previously noted in the record, defendants have acknowledged that plaintiff paid $544,000 in agreed upon extension fees, although we asserted a counterclaimed for $283,000 in then claimed outstanding extension fees.

4. One example of the smokescreens to which Mr. Mulligan refers in his accompanying Affirmation, which Mr. Millstein has attempted to foist upon the Court, can be found in his assertions (at ¶¶ 7-9 of his affidavit, and Exhibit B thereto) that he learned by a letter dated October 2, 2003 that New York State had changed the "dissolved Uranium standards (MCL) to lower levels, therefore the Bellvale Water System which was across the street from our property would no longer be in compliance . . ." thus resulting in a drastic change to the economics of the project, i.e., a possible additional cost of $800,000. Mr. Millstein goes on to state that he had "recently" discovered that the "new or proposed MCL standards never came to pass" and that this "mistake" caused a delay in approvals, construction, sales, revenue and the completion of the project itself. I wish to point out that, aside from the fact that Mr. Millstein never discussed wells, MCL or Uranium standards with me, he does not clarify exactly **when he** learned of this development. Further, the letter upon which he relies does not state that the

3

referenced water system "would no longer be in compliance" but rather that the purported new regulations which would be in place by January 1, 2004 . . . "will **most likely** make the Bellvale System out of compliance for dissolved uranium." (Emphasis added). More importantly, it is apparent that plaintiff must have obtained the original knowledge of the possible new uranium regulations at a time between the execution of the first amendment to the original Contract[1] effective June 20, 2003 and the second amendment to the Contract effective July 29, 2004 (attached as Exhibits B and C to the complaint). Plaintiff, armed with this knowledge, did not choose to allow the first amendment to expire and seek to terminate the Contract for failure to obtain developmental approvals. Rather, it chose to pay the agreed upon extension fee for the second ninety (90) day extension period beginning November 1, 2003 and ending January 31, 2004. It further paid for two more extensions under the first amendment to the Contract alone, thereby extending the Closing until July 30, 2004. In other words, plaintiff bargained for continued extensions in the face of known potential roadblocks to the completion of the development of the project. Plaintiff chose to amend the original Contract seven (7) more times (Exhibits C through I to the Complaint) in order to fulfill its contractual obligations. It cannot now be heard to use these roadblocks as an excuse to avoid its obligations.

5. In short, the original closing was to take place in 2003. Eight amendments to the Contract later, the closing was extended until September 15, 2008. Despite these agreed upon contract extensions requested by plaintiff in order to assist Mr. Millstein any way reasonably possible in order that plaintiff be able to close the transaction, BCM ultimately chose to initiate a groundless lawsuit which we were necessarily forced to defend. The lawsuit resulted in the

---

[1] Not to be confused with the First Amended Stipulation entered into several years later.

Stipulation and Order which was intended to achieve a final amicable resolution of the matter, by the terms of which BCM was granted further extensions to close until as late as March 31, 2010. Yet, once again, in good faith, we agreed to **two more** fully negotiated contract extensions by way of the First and Second Amendments to the Stipulation (See, Mulligan Aff., Exhs. B and C). When facing yet another default, BCM demanded another "restructuring" or "binding arbitration." I am confident that defendants have acted in great "good faith" in order to have this project completed, and the only act of "bad faith" is the now a very belated attempt by BCM to avoid the obvious and make unfounded charges of defendants' "bad faith."

6. Mr. Millstein seeks equity from the Court, but equity works both ways. He is aware that I serve as a Trustee of the Oprandy Trust whose beneficiaries have been more than patient in dealing with the prolonged attempt to sell this property. I have an obligation as a Trustee to bring this matter to closure. I respectfully request that the Court grant the relief requested in Defendants' motion.

_____
Peter Oprandy

Sworn to before me this
30th day of September, 2011

_____
Notary Public

APRIL C. CLARK
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES MAY 31, 2013
COMMISSION # 257156